UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,

                                        REPORT AND
                                        RECOMMENDATION

                - against -
                                        CR 09-573 (BMC)(MDG)

EARL MORGAN,

                        Defendant.

- - - - - - - - - - - - - - - - - -X

GO, United States Magistrate Judge:

     Defendant Earl Morgan is charged with possession of a firearm
after having previously been convicted of a felony in violation of
18 U.S.C. § 922(g)(1).  By electronic order filed August 19, 2009,
the Honorable Brian M. Cogan has referred this case to me to
handle all pretrial matters.  I address in this report and
recommendation three remaining motions raised by Mr. Morgan in his
"Pre-trial Motions" (ct. doc. 25), which raise issues not within
my pretrial authority to hear and determine.  See ct. doc. 25; 28
U.S.C. § 636(b)(1)(A).  In these three motions, Mr. Morgan seeks
(1) suppression of the physical items seized from him on July 25,
2009, (2) in limine rulings and (3) dismissal of the indictment.

## BACKGROUND

     In challenging the lawfulness of the search of his person and
subsequent arrest, defendant claims that the officers who arrested
him stopped and searched him on the false pretext that they saw

him urinating.  See Affirmation of Earl Morgan ("Morgan Aff.")
(ct. doc. 27) at ¶ 2.  He also denies that he possessed the gun
that the officers claim they found on his person and that the
weapon "must have been in police possession, not his, when
arrested."  Affirmation of Lawrence Mark Stern ("Stern Aff.")
(ct. doc. 26) at ¶ 6; Defendant's Memorandum of Law in Support
of His Pre-trial Motions (ct. doc. 28) at 9, 13.  Defendant
contends that the officers stopped and arrested him to question
him for other reasons:  that they sought to question him in
connection with a murder investigation, that he was a suspect in
a recent assault or shooting or that he had been targeted for
harassment for having sued officers in the NYPD and as evidenced
by claims asserted in that past lawsuit.  Stern Aff. at ¶ 4.

This Court conducted a suppression hearing[1] on April 15 and
28, 2010.[2]  The government called New York Police Department
("NYPD") Officers Francisco Tejada and Washington Mosquera of the
84th Precinct.  The defendant called NYPD Sergeant James Glancy,

---

[1]   Defendant also sought to suppress statements made.  See
Stern Aff. at ¶ 2.  Since the Government advised that it would not
introduce any statements made by the defendant at the 84th
precinct station (ct. doc. 40) and defendant's counsel stated in
his reply memorandum of law that he was seeking to suppress the
statements at the station and not statements made at the arrest
scene (ct. doc. 32 at 6), this Court limited the suppression
hearing to the issue of physical items seized from defendant.  See
electronic order filed on March 25, 2010.  Insofar as a formal
disposition of this facet of defendant's motion is necessary, I
respectfully recommend that defendant's motion to suppress
statements made by him be denied as moot.

[2]   References to pages in the transcript of the hearing held
on April 15 and April 28, 2010 shall be preceded by "4/15/10 Tr."
(ct. doc. 77) or "4/28/10 Tr." (which will be docketed).

NYPD Sergeant Titus Parham and NYPD Sergeant Christopher Smith of the 84th Precinct, NYPD Detective Ray Martinez of the Gun Enhancement Unit, NYPD Detective Albert Brust of the 88th Precinct, Esther Bartling, a civilian employee of the NYPD, Special Agent Ishmael Hernandez of the United States Bureau of Alcohol, Tobacco, Firearms and Explosives, Donald Feury, Glenda Evans and Derrick McDuffie.

Since the witnesses called offer very different versions of the events surrounding the stop and arrest, their testimonies are briefly summarized here. Officers Tejada and Mosquera and Sgt. Glancy were the three officers on patrol together prior to Morgan's arrest by Officer Tejada. All three testified that they saw Morgan urinating near a street corner and participated in stopping Morgan and Derrick McDuffie before Officer Tejada found a gun on Morgan. Mr. McDuffie testified that prior to the arrest, he accompanied Morgan to the apartment of Glenda Evans to pick up some clothes the defendant had left there. After they left, Morgan urinated at the end of an inclined ramp not visible from the street. Glenda Evans confirmed that Morgan had gone with McDuffie to her apartment to pick up a bag of clothes and that Morgan had used her bathroom prior to leaving.

Defense counsel called Agent Hernandez to point out discrepancies between the testimonies of the officers and prior statements given to the agent. Defendant also presented Donald Furey, a private investigator he retained, to testify about the scene of arrest and Ms. Bartling to testify about the radio calls

made by the officers which he contends undermines certain aspects of the stories of the three officers regarding the stop and arrest.  Last, defendant questioned the remaining officers of the NYPD regarding the practices relating to the dissemination of information regarding persons wanted for questioning in order to support his theory that the officers involved in the arrest were motivated to arrest defendant because he was sought for questioning in connection with a murder investigation.

The defendant submitted an affirmation in support of his motion to suppress, but did not testify.  The defendant states that he walked past the southeast corner of Navy Street and Park Avenue without stopping or urinating.  Morgan Aff. at ¶ 2.  After crossing Navy Street, a man, along with four or more other men who apparently were all police officers, grabbed him from behind. Id.  One officer searched the defendant and took the bag that the defendant was carrying.  Id.  The man who grabbed him then held up a gun and said, "We got it right here."  Id.

## FACTS

This Court makes the following findings of fact based on the testimony adduced at the suppression hearing.[3]

---

[3] Absent the defendant's live testimony and the opportunity for cross-examination, the Court cannot assess his credibility or truthfulness.  As a result, I credit the testimony of the live witnesses over the conflicting contents of the defendant's affirmation.  See United States v. Miller, 382 F. Supp. 2d 350, 362-63 (N.D.N.Y. 2005); United States v. Al-Marri, 230 F. Supp. 2d 535, 539 (S.D.N.Y. 2002); United States v. Juliano, No. 99 Cr. 1197, 2000 WL 1206745, at *3 n.3 (S.D.N.Y. Aug. 24, 2000); United States v. Frank, 8 F. Supp. 2d 284, 291 (S.D.N.Y. 1998).

Findings of Fact

On July 25, 2009, at approximately 12:44 a.m., Officers Tejada and Mosquera and Sgt. Glancy, who are in the Anti-Crime Unit of the 84th Precinct, were on patrol in an unmarked car near the border between the 84th and 88th precincts, a high crime area.  4/15/10 Tr. at 8-11, 50, 54, 143, 179.  All were in plainclothes, with Officer Mosquera driving, Officer Tejada sitting in the front passenger seat and Sgt. Glancy sitting in the rear of the car.  Id. at 10-11, 143-44, 164, 187.  They were in the area because there had been a radio call of an assault in progress in the vicinity of the Ingersoll housing complex in the 88th precinct and the officers would be able to respond if the perpetrator were to cross over to the Farragut housing complex in the 84th Precinct.[4]  Id. at 53-56.

While driving southbound on Navy Street, the officers stopped at a red light under the overpass for the Brooklyn Queens Expressway where Navy is intersected to the east by Park Avenue and by Tillary Street to the west. 4/15/10 Tr. at 13-18; Gov. Exhs. 1 and 2.  At that intersection where they were stopped, there are two traffic lanes going in each direction on Navy Street, as well as a left hand turning lane from the southbound lanes.  The patrol car was stopped at either the turning lane or the next lane to the right.  Id. at 13-18; Gov. Exhs. 1 and 2.

---

[4] The Farragut housing complex is across Navy Street from the Ingersoll housing complex.  Id. at 53-55.

From their car, Officers Mosquera and Tejada observed the defendant walking with another man along the street near the southeast corner of the intersection.  At the corner, there is an apartment building set back from the street which is surrounded by a small grassy area and bounded by a low fence running along the sidewalk.  The defendant was wearing a white T-shirt tucked into the front of his blue jeans and a red hat.  Id. at 21-25, 32, 78, 145-46, 187; Def. Exh. A.  All three officers observed the defendant stop and face the building.  Although the defendant had his back to the officers, all three officers believed that the defendant was urinating onto the grass based on the way he was standing and the placement of his hands.  Id. at 29, 79-82, 146, 164-65, 188.  The area around the defendant was illuminated by several street lights near the street.  Id. at 42, 14; Gov. Exh. A; Def. Exh. M.  The other man, later identified as Derrick McDuffie, was standing approximately 5 to 10 feet from the defendant, apparently waiting for the defendant to finish urinating.  Id. at 87, 188-89.[5]  The defendant and Mr. McDuffie then walked southwest, crossing Navy Street at the intersection with Tillary Street diagonally southbound.  Id. at 30, 147, 190.

Officers Tejada and Mosquera discussed and decided to issue the defendant a summons for public urination.  When the traffic light turned green,[6] Officer Mosquera drove through the

---

[5]  Officer Mosquera could not recall where McDuffie was standing.  4/15/10 Tr. at 154.

[6]  Since the typical cycle for traffic light changes is

(continued...)

intersection to the southwest corner of Navy Street and Tillary Street.  Officer Tejada and Sgt. Glancy exited the car first, just past an island formed by the turning lane from Tillary Street to the southbound lane of traffic of Navy Street.  Mosquera exited later after parking the car, which he stopped past the turning lane on Navy.  Id. at 31, 38, 91, 147-48, 166-67, 169, 191, 200; Gov. Exhs. 1; 2B.

As the defendant and Mr. McDuffie walked southbound on Navy Street and under scaffolding over the sidewalk along the side of the building on the southeast corner, Officer Tejada approached the two men from behind and called out "Police."  He did not have his gun drawn.  4/15/10 Tr. at 35, 37-38, 62, 91; Def. Exhs. P-1, P-6, P-7, P-8 and P-9.  The area under the scaffolding was lit by street lights and light bulbs mounted on the scaffolding.[7] 4/15/10 Tr. at 42, 150, 200.

The defendant turned quickly to his left by pivoting on his left foot to turn his body sideways to Officer Tejada.  He also took a few steps backward and reached toward his right front pants pocket with his right hand.  Id. at 35-38, 93-94, 101-02, 106. Officer Tejada described the defendant's body maneuver as

---

[6](...continued)
between 30 seconds and a minute, 4/15/10 Tr. at 66, the officers moved through the intersection a short time after having observed Morgan urinate.

[7] Officer Tejada described the lighting as "reasonable," while Sgt. Glancy testified that the area was "dimly lit" and could not recall if there had been scaffolding.  4/15/10 Tr. at 200-01.  After interviewing Sgt. Glancy, Agent Hernandez wrote in his notes that the Sgt. had stated the area was dark.  Id. at 200.

"blading," a practice used to block an officer's view of one side of a suspect's body. Id. at 35, 94-95, 98-99. Although the defendant angled his right side away from Officer Tejada, Officer Tejada was able to see a "solid bulge" in the defendant's right front pants pocket which he believed to be a weapon based on its shape. Id. at 35-36, 39, 98-99, 102, 104, 106. Concerned for his own safety, Officer Tejada said "Police, let me see your hands." Id. at 39, 96-97. The defendant raised his left hand and brought a plastic bag he was holding in his left hand up to eye level. Id. at 39. Officer Tejada instructed the defendant to drop the bag and put his hands on the nearby fence along the sidewalk next to the building. Id. at 39-40, 148; Gov. Exh. 5; Def. Exh. P-1. Although the defendant initially complied with that instruction, he repeatedly took his hand off the fence and pressed the right side of his body against the fence. Id. at 40, 123-24, 148-49. Officer Tejada had to use force to hold one of Morgan's hands on the fence. 4/15/10 Tr. at 124-25.

Seeing Officer Tejada struggling with the defendant, Officer Mosquera walked past Sgt. Glancy and McDuffie to Morgan and Officer Tejada. Mosquera then grabbed and held the defendant's other hand.[8] Id. at 150, 173. Officer Tejada was then able to

_____

[8] Officer Mosquera testified that he walked over to the defendant's right side and put his left hand on the defendant's right shoulder and his right hand on the defendant's right hand while Officer Tejada was in back of the defendant. Id. at 173-74. Officer Tejada testified that Officer Mosquera walked over to the defendant's left side while Officer Tejada was on the defendant's right side and held the defendant's right hand to the fence. Id. at 124-25.

-8-

feel the outside of the defendant's right front pocket and
detected what he believed to be the butt of a gun.  Id. at 40,
123-25, 148-49.  Officer Tejada alerted Officer Mosquera in
Spanish that the defendant had a gun.  Id. at 40, 125, 149, 174.
With Officer Mosquera's assistance, Officer Tejada handcuffed the
defendant behind his back, reached into the defendant's right
front pants pocket and removed a loaded gun.[9]  Id. at 40, 125-26,
149, 174-76.  The defendant said, "Fuck you, that's not mine."[10]
Id. at 41.  The two officers then walked the defendant toward the
patrol car.  Id. at 179.

    After Officer Tejada put the gun he removed from the
defendant into his own pocket, he made a radio transmission to the
police dispatcher at 12:46 a.m. stating that:  "Two males stopped.
Navy and Park, can I have one unit [] non-emergency?"  Six to
eight officers subsequently arrived on the scene.  Id. at 40, 44,
46, 71-72, 125-26, 203; 4/28/10 Tr. at 303; Def. Exhs. L, T.

    Meanwhile, Sgt. Glancy, who had been talking to Mr. McDuffie,
pulled Mr. McDuffie toward the back of the police car when he saw
Officer Tejada struggling with the defendant.  Id. at 41, 195-96.
Sgt. Glancy then made McDuffie place his hands on the back of the
car.  Id. at 198-199.  After he had handcuffed the defendant,

---

    [9] Officer Mosquera testified that although he saw the gun in
Officer Tejada's hand, he did not see where Officer Tejada
retrieved the gun from.  Id. at 174-76.

    [10]  Officers Tejada and Mosquera testified that the defendant
was standing during the entire encounter, but Sgt. Glancy
testified that he saw the defendant go to the ground during the
struggle.  Id. at 126, 176, 202.

Officer Tejada walked over to Sgt. Glancy and told him to handcuff Mr. McDuffie as a safety precaution because he had found a gun. Id. at 41-42, 44, 126, 197, 199.

Officer Tejada made a second transmission on his radio that he had effected an arrest, stating "one under" and asked for confirmation of the time for the arrest.  The dispatcher then called back to say that the "under" time was 12:49.  See 4/28/10 Tr. at 314; Def. Exh. L.

As Officers Tejada and Mosquera and Sgt. Glancy testified, they had never met the defendant, spoken to him or heard his name prior to his arrest.  Id. at 45-46, 150-51, 162, 207.  All three officers also did not know that the defendant was wanted for questioning.  Id. at 74, 112, 162, 193-94.

After defendant was taken to the precinct, Officer Tejada completed vouchers for property taken from the defendant, but did not indicate on the form from where the property was taken.  One voucher was for a cell phone, battery charger, keys on a ring and photos, but Officer Tejada could not recall whether these items were recovered from the defendant's pocket.  Id. at 110.  Other property that he vouchered was a plastic bag which defendant had been holding, as well as two pairs of shorts and a pair of construction gloves that were in the bag and a construction helmet recovered from the ground.  Id. at 88-90, 110, 118.  He also vouchered the gun retrieved from the defendant, removing the magazine and cartridge from the weapon when doing so.  Id. at 111-12.  The gun recovered is a Bersa .380 caliber handgun measuring

over seven inches long along the top of the barrel.  When I picked
it up, it was fairly heavy for its size and seemed to weigh
several pounds.  Complaint at ¶ 4 (Def. Exh. B); Gov. Exhs. AA,
BB, CC.

On the morning of July 25, 2010, Detective Brust of the 88th
precinct went to the 84th precinct in response to a fax sent by
the "wanted desk" in Manhattan notifying that the defendant, who
was named on an Investigation Card ("I-card"),[11] had been arrested.
The I-card for Earl Morgan had been issued by Detective Thomas
Donahue of the 88th precinct indicating that the defendant was
sought as a witness to a homicide committed in the 88th precinct.
Id. at 267-68, 280-81, 369; Def. Exh. O.  Detective Donahue had
issued approximately 10-15 I-cards in connection with the same
murder.  Id. at 282.

Det. Brust has known the defendant for approximately ten
years from his prior assignment in the Housing Bureau of the NYPD.
Id. at 277-78, 280.  Although he never arrested the defendant, he
has issued him summonses and knew the defendant to be a drug
dealer who had been arrested in connection with a shooting.  Id.
at 277-78, 280.  Detective Brust had never met Officer Tejada,

---

[11]  An I-card can be issued by an NYPD investigator to give
notice that someone may be a witness wanted for questioning.
4/28/10 Tr. at 267, 368-69.  I-cards can also be issued to give
notice of persons sought for whom there is probable cause for
arrest or persons who are suspects, but where probable cause for
arrest is lacking.  Id.; see Def. Exh. O (three "Sought As"
categories).  The name of a person on an I-card is inputted into a
NYPD computer system which flags the name if the person's name is
later inputted into the system because of a stop or arrest.
4/28/10 Tr. at 349, 367, 370.

Officer Mosquera or Sgt. Glancy prior to the defendant's arrest.
Id. at 279.  Nor was Detective Brust aware that the defendant had
filed a civil lawsuit against NYPD officers and detectives of the
88th Precinct in 2003.  Id. at 278.  See also complaint in Earl
Morgan v. The City of New York, 03-CV-3772 (Def. Exh. Q).

Assessment of the Evidence

     In making the above findings, I found Officers Tejada and
Mosquera and Sgt. Glancy more credible than Mr. McDuffie on the
critical facts with respect to the defendant's suppression motion:
that they saw defendant urinating in public and that in the
ensuing stop, Officer Tejada recovered a gun from the defendant's
person.  The three officers were generally consistent in their
accounts, even though their testimonies varied on several details.
I did not find the discrepancies to be sufficiently significant to
undermine their otherwise credible testimony.  The gaps in their
memories can be attributed, in part, to the lapse in time between
the defendant's arrest and the suppression hearing nine months
later.

     Preliminarily, I note that although the incident occurred in
the middle of the night and the area where the defendant was
alleged to have urinated was illuminated only by street lights, I
find believable that the officers could have made the observations
of the defendant from their patrol car, as they testified.  As
Donald Furey, the private investigator hired by the defendant to
photograph and measure the scene of arrest, acknowledged, the

distance from the patrol car to where the officers claimed they saw the defendant urinating was not greater than the distance of the large intersection outside the Brooklyn federal court house (at Tillary Street and Cadman Plaza East) from the center median strip catty-corner to a bus stop on the opposite side. 4/28/10 Tr. at 335-36. The sight line involved is across four lanes of traffic going in one direction and two lanes of traffic of an intersecting street. At this distance,[12] the posture and arm positions of persons at one end are easily observable from the other end.

The most dramatic discrepancies are in the locations marked by each officer on identical photographs of the southeast corner of Navy and Park to indicate where they saw the defendant urinating, as well as where Mr. McDuffie was standing. See Def. Exhs. E, M, N. According to Mr. Feury, who measured the distance between the points marked, the distance between the tree near where Officer Tejada marked the photograph and the lamppost near where Sgt. Glancy marked the photograph was 11 feet. Id. at 326-

---

[12]  Mr. Feury measured the distance at 145 feet between the officers' vantage point at the stop light and the area that Officer Tejada indicated that the defendant was urinating. 4/15/10 Tr. at 86; 4/28/10 Tr. at 323-26. Mr. Feury conceded that the measuring stick he used to calculate these distances is not entirely accurate on rough surfaces but he testified that he independently confirmed that the stick has a margin of error of one foot. 4/28/10 Tr. at 323, 332-33, 335. However, he did not state whether that margin of error applied to the distance measured. Even assuming the accuracy of the 145 feet measurement (which appears to me to be too large a distance given the number of traffic lanes there and my knowledge of the typical width of lanes), the body and arm positions would still be visible.

27; Def. Exhs. E, N.  The distance between Officer Tejada's mark on the photograph and the opening in the fence near where Officer Mosquera marked the photograph was 25 feet.  Id. at 326-27; Def. Exhs. E, M.  The distance between the lamppost near where Sgt. Glancy marked the photograph and the fence opening near where Officer Mosquera marked the photograph was 33 feet.  Id. at 327. Besides the passage of time, these discrepancies can also be explained by the slightly different angle from which each officer saw the defendant and, more importantly, the imprecision inherent in using a two dimensional image to depict a three dimensional setting.  Indeed, the measurements by Mr. Furey of the distances between the trees are greater than they appear in the photograph of the scene marked by the officers.  See, e.g., Def. Exh. E.  The spacing and distances of objects in that photo also appear to be different from the photograph of the same corner taken from a different angle introduced by the Government.  Compare Gov. Exh. 3 with Def. Exh. E.  Notably, each officer placed his mark to the left of a tree in the same general area on the southeast corner of the intersection of Navy Street and Park Avenue depicted in the photograph.

In addition, Mr. Feury testified that he conducted an experiment at different times of the day involving an assistant squirting water from a bottle at the spot that Officer Tejada indicated the defendant urinated while Mr. Feury watched from his car at the underpass intersection at Navy Street and Park Avenue stopped on the line dividing the right and left southbound lanes.

4/28/10 Tr. at 327-29.  Mr. Feury was unable to see the stream of water squirted by his assistant, even in the daytime with the assistant standing at different angles.  Id. at 329.  Defendant may be correct that Officer Tejada would have had difficulty seeing urine of the defendant from where he was sitting in the patrol car.  However, Officer Tejada, who has been a police officer fewer than five years, is likely to have better vision than Mr. Feury, who appears considerably older and worked as a corrections officer beginning 1972.  4/15/10 Tr. at 4; 4/28/10 Tr. at 320.  More importantly, irrespective of whether Officer Tejada's testimony that he could see a stream of urine is an embellishment of an observation not likely possible, I find the Government has established by a preponderance of the evidence that the officers could determine from the way the defendant was standing that he was urinating when he stopped and faced the building.

In contrast, I found Mr. McDuffie not credible in his testimony that the defendant did not urinate in an open, public place, but rather, at a spot that could not be seen from the street.  4/15/10 Tr. at 218, 229, 248.  To do so, Mr. McDuffie told a convoluted story to explain the path that he and the defendant took in order to urinate out of public view.  He testified that after they left Ms. Evans' apartment at approximately 1:40 a.m., the two crossed Navy Street, walked under the scaffolding along the side of a building at the corner and down a ramp on the south side of that building to a basement

entrance where both men took turns urinating.  Id. at 217-18, 222, 225-26, 230; Def. Exhs. P-10, Q.  After urinating, Mr. McDuffie states that he and the defendant headed up Navy Street to his home on Nassau Street, which is two blocks north of Park Avenue.  They then had a discussion in which he urged the defendant not to go home because of the lateness of the hour.  He ultimately agreed to accompany the defendant to Myrtle Avenue, rather than Nassau Street, to hail a cab.  They then headed back down Navy Street (presumably south) where they were then stopped in the middle of the scaffolding by officers.  Id. at 219, 231-32.  Besides giving the wrong time for the events, Mr. McDuffie's expressed concern that he did not want the defendant, a grown man who had been drinking at his home for several hours, to be going home at that time of the night is hard to believe.  That they had such a conversation after urinating also does not make sense since Mr. McDuffie had ample opportunity to have the discussion during the walk from his apartment to Ms. Evans's apartment or just after they left that apartment.  Id. at 214-15, 236-37.

Mr. McDuffie's testimony that the two urinated down the ramp coincidentally refers to the very same illegal conduct which defendant claims the arresting officers fabricated as the basis for the stop, but at a different location a few minutes earlier. Despite Mr. McDuffie's testimony that he told Agent Hernandez that both he and the defendant had urinated at this secluded location, according to Agent Hernandez, Mr. McDuffie told him that the two men urinated in yet a third location and did not mention that it

-16-

was down a ramp and out of public view.  Id. at 382, 384-85.
Assuming Agent Hernandez misunderstood Mr. McDuffie and the two
men did discreetly urinate down the ramp in an inconspicuous
location, Mr. McDuffie would have had no reason to tell the
defendant, "I'll watch your back, you watch mine."  Id. at 230.
Mr. McDuffie clearly had a motive to lie to protect the defendant,
a lifelong friend whom he referred to as a "cousin."  Id. at 239.

    I also do not credit Mr. McDuffie's testimony regarding the
events leading to the arrest after he and the defendant walked
south on Navy Street.  He testified that a police officer with his
gun drawn ran up behind them and told them that they matched the
description of suspects in a shooting in the area.  Then Mr.
McDuffie was handcuffed to a fence surrounded by four police
officers in plainclothes while the defendant was surrounded by 8
to 12 police officers in plainclothes and taken to the ground and
handcuffed.  Id. at 220, 233, 234, 239, 241-43.  That so many
officers would be assembled at that location past midnight does
not seem to be likely under the facts related.  The recording of
the radio transmissions made concerning this event, as well as the
written summaries of the transmission in the Sprint Report
inputted by the radio dispatcher, supports Officer Tejada's
testimony that he radioed to request one supporting unit to the
location on a non-emergency basis and that other officers then
came to the scene. 4/28/10 Tr. at 303-04, 313-14; Def. Exhs. L, S

-17-

and T.  The recording also contains a transmission from the dispatcher that no further units needed to respond.  Def. Exh. T.[13]

Mr. McDuffie's testimony also diverges from prior written statements defendant submitted regarding the number of officers involved in the stop and arrest.  The defendant stated in his affirmation that he was grabbed by an officer with four or more other men.  Morgan Aff. at ¶ 2.  On the other hand, Mr. McDuffie had signed an affidavit that he and the defendant "were grabbed by approximately eight men in plainclothes."  Affidavit of Derrick Morgan dated January 7, 2010 submitted in support of ex parte application dated March 10, 2010 (ct. doc. 36).

---

[13]  The following is a transcript of the transmissions on the audio recording introduced by the defendant.  Def. Exh. T.  The times are taken from the Sprint report (Def. Exh. L) and the identification of Sgt. Glancy is based on the code of 84 SP 8 on the Sprint report, which stands for Sgt. of the 84th precinct. 4/28/10 Tr. at 314.

12:46   (Tejada): "Two males stopped, Navy and Park, can I have one unit 85 non-emergency"

12:48   (Tejada): "No further units at Navy and Park"

12:49   (Unidentifed) - *inaudible*

12:49   (Dispatcher): "No further units, no further units Navy and Park, absolutely no further Navy and Park"

12:50   (Glancy): *inaudible* . . . one under from this location, thank the units

12:50   (Dispatcher): "Stand by for under time"

12:50   (Glancy): "Transporting one back to precinct for 84 crime"

12:50   (Dispatcher): "Take your under time at midnight 49"

12:50   (Glancy): "Thank you, thank all the units central"

Ms. Evans, who is the mother of defendant's two children, may also have reason to want to assist defendant. Id. at 250.  In any event, her testimony that the defendant used the bathroom at her apartment shortly before the stop does not necessarily contradict the testimony of the officers that the defendant later urinated in public, or in a secluded area as indicated by Mr. McDuffie.

I do not find persuasive the defendant's argument that it would have been "a remarkable feat" for him to have urinated the way described by the officers because of all the items he was carrying.  If Mr. McDuffie is believed, the defendant was able to urinate around the corner from the location identified by the officers, notwithstanding his bags; the defendant presumably would have been able to deal with his possessions in similar fashion.  The officers simply were unable to recall whether the defendant was carrying anything prior to the stop.  A memory lapse of this kind does not adversely affect my evaluation of this aspect of their testimony.  Although Officer Tejada did not recall the defendant carrying anything prior to the stop, he credibly testified that the defendant held and raised to eye level a plastic bag in his left hand.

Defendant also argues that Officer Tejada could not have seen a bulge in the defendant's front right pocket given the position of the defendant relative to Officer Tejada after the officer told him to stop.  Although his hearing testimony was far more detailed than his grand jury testimony, there were no contradictions between the two testimonies.  Officer Tejada also demonstrated

several times during his testimony his initial encounter with the defendant.  While defendant may be correct that Officer Tejada would not be able to see the defendant's front right pocket when he first approached, both did not remain standing still in the same position and the officer was, in fact, moving toward the defendant.  Given its size and weight, the weapon would have caused a visible bulge in the pocket of jeans the defendant was wearing at the time of his arrest.  See Def. Exh. A; Gov. Exhs. AA, BB, CC.

The defendant also argues that the area under the scaffolding was too dark for Officer Tejada to have observed the bulge in defendant's pants pocket.  He points to the incorrect notation on an arrest form made by Officer Tejada that the color of the defendant's jeans was black, instead of blue, as evidence of how dark the area was.  See 4/15/10 Tr. at 107-08.  However, it is undisputed that there was lighting under the scaffolding.  Shapes of large objects under clothing would be visible, even under dim lighting.  In any event, Officer Tejada had ample opportunity to view the defendant under better lighting conditions at the precinct prior to making the arrest report.  His description of the color of the jeans was clearly a mistake and inconsequential under the circumstances.

Further, I do not find significant the discrepancies between the testimonies of Officers Tejada and Mosquera as to where each officer was standing as they struggled to secure the defendant against the fence.  Irrespective of which side of the defendant

-20-

each officer stood, Officer Tejada had observed the bulge in the defendant's right pants pocket earlier and, as discussed below, had reasonable suspicion to pat down the defendant at that point.

Perhaps a more serious discrepancy in the testimonies of the officers is Agent Hernandez's statement that Officer Mosquera said in an interview that he saw both the defendant and another person urinating.  4/28/10 Tr. at 375; Def. Exh. X.  Agent Hernandez gave this testimony only after reviewing a memo he wrote, and such testimony is inconsistent with the hearing testimonies of the three officers that they saw only the defendant urinating.  This discrepancy could have resulted from a mis-communication between Agent Hernandez and Officer Mosquera or, given the agent's initial lack of memory, reflects his reliance on notes he imprecisely and hurriedly jotted down.  The memo contains short notations of statements made and the terse, handwritten note at issue simply states:  "Sees Δ & another in corner urinating."  Def. Exh. X.  That notation could mean that the defendant was with another person and was observed urinating in the corner or that two persons were seen urinating.  Again, I do not find it sufficient to cast doubt on the entirety of the otherwise corroborated testimony adduced at the hearing that the officers saw only the defendant urinating.

Despite calling 10 witnesses, the defendant was unable to adduce any credible evidence to support his various theories on why the defendant was stopped by the officers.  There is absolutely no evidence that any of the officers involved had a

reason to retaliate against the defendant because he brought a civil rights suit against officers of the 88th Precinct in 2003. See Complaint, 03-cv-3772 (Def. Exh. Q). Even if the allegations in the complaint were all true, they are not evidence that the harassment has continued or that he would be targeted by officers of the 84th precinct. None of the officers involved in the arrest had seen or heard of the defendant prior to his arrest. Nor did these three officers know any of the 88th Precinct officers named in the defendant's prior lawsuit.

Moreover, the three officers involved in the arrest not only did not know that the defendant was listed on an I-card and wanted for questioning, they had no reason to know or find out about the I-card. Notwithstanding defense counsel's insistence that the officers were untruthful because the I-Card for Earl Morgan should have been (and arguably was) posted in the Crime Information Center of the 84th precinct, there is no requirement that such information be posted. The pertinent section of the NYPD Patrol Guide regarding postings of I-Cards in Crime Information Centers refers only to the posting of "Photos of 'Probable Cause to Arrest' Investigation Card" and directs that:

    I.    Commands with a large number of I-Cards, should post photos and information regarding individuals who are the subjec8ts of "Probable Cause to Arrest" I-Cards for Homicide, Non-Fatal Shooting and Robbery.

    ii.    Photos regarding "Probable Cause to Arrest" I-Cards for subjects wanted for other crimes may be maintained on clipboards in the Crime Information Center.

Interim Order No. 51 issued 9-26-07 at § 4.c. (Def. Exh. U).
Defendant is simply mistaken in relying on a different section of
the Patrol Guide regarding "Wanted Person Photos" to argue that
Earl Morgan's photograph should have been posted.  Id. at § 4.b.
In fact, the evidence is undisputed that I-cards issued for a
witness are not posted in the 84th precinct station house,
particularly if a witness does not live within the confines of
that precinct.  4/28/10 Tr. at 351-53, 362-63, 372-73.  Since the
three officers involved were not, and had no reason to be, aware
prior to the arrest of defendant on July 25, 2009 that the
defendant was the subject of an I-card, there is no basis for
defendant's argument the stop and arrest was a ploy to enable
questioning by 88th precinct detectives.

Similarly, there is no credible evidence that the officers
suspected or had reason to suspect that the defendant and Mr.
McDuffie were involved in an assault in the 88th precinct which
led Officer Tejada to patrol near the border of the 88th precinct.
The defendant argues that Officer Tejada made his first radio
transmission at 12:46 a.m. when in the patrol car and points to
the fact that the codes on the Sprint report for his transmission
refer to a reporting of suspicious persons.  However, the codes on
the report were entered by the dispatcher based on Officer
Tejada's description of two males stopped.  Id. at 312.  The
recording of the actual transmission does not include any
reference to suspicious males.  Def. Exh. T.

While the defendant is correct that Officer Tejada could have

-23-

stated in his first transmission that he had recovered a gun and arrested the defendant, the sequence of transmissions supports the officer's version of the facts.  Officer Tejada could not determine at the time he removed the gun from the defendant that there was a basis for arresting Mr. McDuffie.  However, he could see that Mr. McDuffie had his hands on the patrol car with Sgt. Glancy supervising.  Thus, the first transmission is consistent with the testimony that the officers had stopped two men and the situation was under control.

In fact, Sgt. Glancy denied that the defendant and Mr. McDuffie resembled the descriptions of the assailants in a shooting earlier in the day.  4/15/10 Tr. at 191.  Had there been a resemblance and if, as the defendant posits, Officer Tejada viewed the two as suspects and had made the transmission from the patrol car, the officer's request for another unit on a non-emergency basis would make little sense.

The defendant also attempts to make much of the fact that Officer Tejada wrote in his memo book and on the defendant's arrest form that the arrest took place at 12:49 a.m. rather than at approximately 12:46 a.m.  Officer Tejada credibly testified that he created the memo book entry at the station house using the SPRINT report as a reference and that he had observed the defendant and McDuffie one or two minutes before making a transmission at 12:46 a.m. that he had stopped two men.[14]  4/15/10

---

[14]  Defendant's attempt to suggest that a police officer should prepare memo book entries contemporaneously with the events
(continued...)

Tr. at 50.  Officer Tejada also credibly testified that he relied
on the 12:49 a.m. "under time" later given by the dispatcher as
the arrest time, although he had already taken the defendant into
custody by 12:46 a.m.  Id. at 50-51.

Additionally, the defendant points to the UF-250 Stop and
Frisk report regarding the stop of Mr. McDuffie in a further
attempt to support his theory the police targeted the defendant
and thought he was a suspect.  That report contains the notation
that Mr. McDuffie was stopped in part for "association with
persons known for their criminal activity."  Def. Exh. K.  Officer
Tejada testified that he filled out the UF-250 form after the
incident to reflect that Mr. McDuffie was stopped because he was
associating with the defendant who was carrying a gun.  4/15/10
Tr. at 114-15.  This comports with the testimony of Sgt. Glancy
that the sergeant physically moved Mr. McDuffie to the back of the
police car for safety reasons when he saw Officer Tejada grappling
with the defendant.  Sgt. Glancy did not handcuff Mr. McDuffie
until he was instructed to do so by Officer Tejada after Officer
Tejada recovered the gun from the defendant.  None of this
testimony or the report suggests that the notation on the report
referred to any conduct prior to the events of that early morning.

In sum, despite a few conflicting details given by the three
officers, I find that their testimonies and version of the facts,

_____

[14](...continued)
that are being memorialized makes little sense under most patrol
situations and nothing in the Patrol Guide requires this.  See
P.G. 212-08 (Def. Exh. Y).

which I incorporated in large part in these findings, outweigh the contrary and less credible version of events given by defendant's witnesses.  Nor do I find on this record that the testimonies of the officers are too implausible to be unworthy of belief, as defendant argues.

### **DISCUSSION**

Standing

    As an initial matter, the government argues that the defendant has no standing to suppress the gun allegedly seized from him because in his motion papers he disclaims a possessory interest in it.  Govt.'s Opp. at 4.

    More than thirty years ago, the Supreme Court moved away from the concept of "standing" in the Fourth Amendment context in Rakas v. Illinois, 439 U.S. 128, 139-40 (1978).  See Rawlings v. Kentucky, 448 U.S. 98, 104 (1980); United States v. Salvucci, 448 U.S. 83, 87 n. 4 (1980).  In Rakas, the Court explained that the concept of "standing" has been subsumed by substantive Fourth Amendment law so that the fundamental question is "whether the person who claims the protection of the [Fourth] Amendment has a legitimate expectation of privacy in the invaded place." Rakas, 439 U.S. at 143; see also Rawlings, 448 U.S. at 104; Salvucci, 448 U.S. at 87 n.4, 93.  Legal possession of the seized item is not a proxy for determining whether the owner had a Fourth Amendment interest.  Rawlings, 448 U.S. at 105-06; Salvucci, 448 U.S. at 91, 93.  For example, the defendant in Rawlings could not challenge the search of his girlfriend's purse even though he had placed his

drugs there moments before.  See Rawlings, 448 U.S. at 104-06.
The defendant in Salvucci could not challenge the seizure of
checks found in the apartment of his co-defendant's mother.  See
Salvucci, 448 U.S. at 95.  In contrast, the defendant in United
States v. Osorio, 949 F.2d 38, 40 (2d Cir. 1991), successfully
challenged the search of an apartment in which he was an overnight
guest even though "he had no property or possessory interest in
the items seized" from the apartment.

    Here, the government does not dispute that Morgan had a
legitimate expectation of privacy in the "invaded place," his
person.  Given that Morgan's capacity to challenge the search and
seizure depends on his legitimate expectation of privacy in his
person, his purported denial of ownership of the gun does not
defeat his right to contest the lawfulness of the government's
conduct.  See United States v. Smith, 884 F.2d 581 (6th Cir. 1989)
(where heroin was found on defendant's person, "he certainly has
standing to object to a search of his person even if he ultimately
gives a 'how did that get there' reaction to what is found");
United States v. Issacs, 708 F.2d 1365, 1368 (9th Cir. 1983)
(defendant's "denial of ownership should not defeat his legitimate
expectation of privacy in the space invaded and thus his right to
contest the lawfulness of the search when the government at trial
calls upon the jury to reject that denial").  To permit the
government to argue otherwise would allow the government to take
inherently inconsistent positions.  The government cannot assert
at trial that Morgan possessed a gun but rely on his denial of

possession to argue that he did not have the right to invoke his Fourth Amendment rights at the suppression hearing.

Unlike the circumstances at issue in United States v. Torres, 949 F.2d 606, 608-09 (2d Cir. 1991), which the government cites, Morgan did not abandon a container in which contraband is found. In that case, because the defendant disclaimed ownership of the shoulder bag where drugs were found she did not have a legitimate expectation of privacy in the bag. Id. The only other case cited by the government in support of its position merely held that the habeas petitioner had a full and fair opportunity to assert his Fourth Amendment claim under Stone v. Powell. See Martin v. McLellan, No. 97 Civ. 7485, 2000 WL 640662, at *3 (S.D.N.Y. May 17, 2000).

Moreover, a defendant is not required to have an expectation of privacy in the evidence seized in a search. Here, Morgan challenges the stop of his person and may seek to suppress the evidentiary fruits of that seizure under the "fruit of the poisonous tree" doctrine regardless of whether he would otherwise have standing to challenge the seizure of the gun itself. See Wong Sun v. United States, 371 U.S. 471 (1963); United States v. Olivares-Rangel, 458 F.3d 1104, 1117-19 (10th Cir. 2006); United States v. Mosley, 454 F.3d 249, 253 (3d Cir. 2005) (car passenger had "standing" to object to illegal stop of vehicle and seek to suppress gun found); Taborda v. United States, Nos. 03cv2024, 01cr162, 2006 WL 2595952, at *3 n.3 (D. Conn. Sept. 10, 2006) (citing United States v. Kimball, 25 F.3d 1, 4-6 (1st Cir. 1994)).

The defendant need only assert that his Fourth Amendment rights were violated with regard to the poisonous tree, here the stop, and not separately regarding the evidence which constitutes the fruit of that poisonous tree, the gun.

The Stop and Frisk

"On a motion to suppress evidence in a criminal trial, once [the defendant] has established a basis for his motion, the burden rests on the Government to prove, by a preponderance of the evidence, the legality of the actions of its officers." United States v. Echevarria, No. 08 CR. 868, 2010 WL 727224, at *6 (S.D.N.Y. Feb. 22, 2010); United States v. Wyche, 307 F. Supp. 2d 453, 457 (E.D.N.Y. 2004); see also United States v. Pena, 961 F.2d 333, 338-39 (2d Cir. 1992).

The courts have recognized three levels of encounters between the police and individuals, each with different implications under the Fourth Amendment.  First, consensual encounters occur when "an individual willingly agrees to speak with law enforcement personnel." United States v. Glover, 957 F.2d 1004, 1008 (2d Cir. 1992).  Such an encounter does not require any objective level of suspicion so long as "a reasonable person would have felt free to decline the officers' requests or otherwise terminate the encounter." United States v. Thompson, 941 F.2d 66, 69 (2d Cir. 1991); see Florida v. Bostick, 501 U.S. 429, 434 (1991); Glover, 957 F.2d at 1008.  The second type of encounter is a limited investigative stop which is considered a "seizure" and requires that an officer have "a reasonable

-29-

suspicion supported by articulable facts that criminal activity 'may be afoot.'"  Terry v. Ohio, 392 U.S. 1, 30 (1968); see Arizona v. Johnson, 129 S.Ct. 781, 784 (2009).  The third type of encounter is an arrest which must be based on probable cause.  See United States v. Tehrani, 49 F.3d 54, 58 (2d Cir. 1995); Glover, 957 F.2d at 1008.

Here, Officer Tejada approached the defendant in order to issue him a summons for public urination.  I need not determine whether a stop for the purpose of the issuance of a summons is tantamount to a custodial arrest under the Fourth Amendment because, as discussed below, I find that the officers here had probable cause.  See Dorman v. Castro, 347 F.3d 409, 411 (2d Cir. 2003) (refusing to reach the question of whether an issuance of appearance tickets was a seizure when the existence of probable cause was evident).

Under New York law, the police may arrest someone without a warrant for committing a "petty offense" in their presence.  N.Y. Crim. Proc. Law §§ 140.10(1)(a), (2); see United States v. McFadden, 238 F.3d 198, 201-02 (2d Cir. 2001).  The definition of a "petty offense" includes a "violation," N.Y. Crim. Proc. Law § 1.20(39), which is defined as an offense for which a term of imprisonment more than 15 days cannot be imposed.  N.Y. Penal Law § 10.00(3).  Public urination is prohibited by New York City Administrative Code section 16-118(6) and is punishable by imprisonment of no more than 10 days.  See N.Y. City Admin. Code § 16-118(6), (8).  In addition, urinating in public is prohibited

-30-

by section 153.09 of the Health Code, the violation of which is treated as a misdemeanor. See N.Y. Comp. Codes R. & Regs. tit. 24, § 153.09; New York City, N.Y. Charter § 558(e). Thus, a person who is seen urinating in public by a police officer is subject to arrest.

The officers saw the defendant at a distance of approximately 145 feet in an area illuminated by street lamps and determined based on the way he was standing and the placement of his hands that he was urinating. See 4/15/10 Tr. at 29 ("[t]he way that he stood"), 79, 146 ("The way his body was positioned. He was - - - his back was facing us and his feet were apart. And his hands, they were towards his front. Towards his front pockets, towards his waist."), 188 ("He had his back turned to us, his hand was in the crotch area"). The defendant argues that the officers' observations were insufficient to give rise to probable cause. However, "[p]robable cause does not require absolute certainty." Boyd v. City of New York, 336 F.3d 72, 76 (2d Cir. 2003); see Illinois v. Gates, 462 U.S. 213, 231 (1983) (probable cause focuses on "probabilities," not "hard certainties"). "The fact that an innocent explanation may be consistent with the facts as alleged . . . does not negate probable cause." United States v. Fama, 758 F.2d 834, 838 (2d Cir. 1985). I find that the police officers had probable cause to believe that the defendant committed a criminal offense based on articulable facts and were justified in detaining the defendant to issue him a summons.

During a lawful stop, "[t]he investigating officer may also

frisk an individual for weapons if the officer reasonably believes that person to be armed and dangerous." United States v. Colon, 250 F.3d 130, 134 (2d Cir. 2001) (internal quotation marks omitted); see Johnson, 129 S. Ct. at 784; Terry, 392 U.S. at 27, 29-30.  Such a protective search ordinarily is limited to a patdown of the outside of a suspect's clothing, aimed solely at detecting a concealed weapon.  See Terry, 392 U.S. at 29-30; see also Adams v. Williams, 407 U.S. 143, 146 (1972) (search must be "limited in scope to this protective purpose"); Sibron v. N.Y., 392 U.S. 40, 65 (1968).  If the officer feels a weapon when patting down the suspect's clothing, he is permitted to reach into the suspect's clothes to remove it.  See Terry, 392 U.S. at 30.

"The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Id. at 27.  A suspicious bulge in a suspect's pocket can justify a protective search, even in the absence of other indicia that the individual poses a threat to the officer's safety.  See Pennsylvania v. Mimms, 434 U.S. 106, 111-12 (1977) (upholding admissibility of gun discovered in defendant's coat pursuant to protective search during routine traffic stop); United States v. Roggeman, 279 F.3d 573, 579 (8th Cir. 2002) (protective pat down was justified by trooper's observation of bulge in suspect's right front pocket); United States v. Hunter, 291 F.3d 1302, 1307 (11th Cir. 2002) (observation of bulge under suspect's shirt warranted pat down for

weapons); <u>United States v. Hamilton</u>, 978 F.2d 783, 785 (2d Cir. 1992) ("unusual bulge" in suspect's pocket was sufficient to justify frisk of individual detained on suspicion of smuggling narcotics).  Similarly, a suspicious hand gesture, can justify a protective search for weapons.  See <u>United States v. Am</u>, 564 F.3d 25 (1st Cir. 2009) (officers were justified in frisking defendant where he turned towards officers and put hand in pocket); <u>United States v. Mayo</u>, 361 F.3d 802, 807-08 (4th Cir. 2004) (defendant's gesture reasonably suggested to officers that defendant was carrying a gun, giving officers the right to pat him down); <u>United States v. DeBerry</u>, 76 F.3d 884, 885 (7th Cir. 1996) (defendant's "ominous-seeming" gesture entitled officer to stop and pat down defendant to determine whether he was carrying a gun); <u>United States v. Ward</u>, No. 98 CR. 1235, 1999 WL 130653, at *3 (S.D.N.Y. March 11, 1999) (confronted with individual who reached behind his back while talking to police, officer was justified in grabbing individual's hand and seizing gun from his waistband); <u>United States v. Rogers</u>, No. 95 CR. 1136, 1996 WL 422260, at *5 (S.D.N.Y. July 29, 1996) (confronted with robbery suspect "who kept turning her left side away from him and at one point appeared to reach toward that side," officer made "entirely reasonable" decision to frisk suspect).

As discussed in the above findings of fact, when Officer Tejada confronted the defendant, Officer Tejada saw a "solid bulge" in the defendant's pocket which appeared to contain "a heavy object"  which he believed was a weapon based on the "way it

-33-

was shaped." 4/15/10 Tr. at 106.  In addition, the defendant reached toward his right front pants pocket and turned his body in such a way that it partially blocked the officer's view of that side of the defendant's body.  These observations supported a reasonable suspicion that the defendant was armed and justified the patdown search conducted by Officer Tejada.  Officer Tejada initially felt only the exterior of the defendant's pocket, which was no more than necessary to determine whether the defendant was carrying a weapon that might pose a safety risk to Officer Tejada and the other officers.  Feeling the handle of a gun, Officer Tejada reached into the defendant's pocket and removed the gun.  Thus, I conclude based on a preponderance of the evidence that the search of the defendant was lawful and the scope of the search was proportional to the circumstances that justified the search.

Finally, in his post-hearing submission, the defendant raises for the first time the argument that the seized evidence should be suppressed because the stated reason for his stop was the violation of unconstitutional statutes.  As discussed above, the offense of public urination is treated by the New York Administrative Code as a violation while the same conduct is treated as a misdemeanor by the New York City Health Code.  Thus, the same conduct carries a maximum sentence of 10 days under the Administrative Code but one year under the Health Code.  The defendant argues that a statutory scheme that imposes disparate sentences for the same conduct is unconstitutional.

In <u>United States v. Leon</u>, 468 U.S. 897 (1984), the Supreme

Court held that the exclusionary rule would not bar the
prosecution from using evidence obtained by officers acting in
reasonable reliance on a search warrant subsequently found to be
invalid.  468 U.S. at 922.  This good faith exception to the
exclusionary rule was extended by the Court in Illinois v. Krull,
480 U.S. 340 (1987), to cases in which the police seized evidence
while acting in reasonable reliance on a statute that was later
found to be unconstitutional.  The Court reasoned that the
"application of the exclusionary rule will not deter a violation
of the Fourth Amendment by police officers because the officers
are merely carrying out their responsibilities in implementing the
statute."  Id. at 355 n.12.  However, "[a] statute cannot support
objectively reasonable reliance if, in passing the statute, the
legislature wholly abandoned its responsibility to enact
constitutional laws.  Nor can a law enforcement officer be said to
have acted in good-faith reliance upon a statute if its provisions
are such that a reasonable officer should have known that the
statute was unconstitutional."  Id. at 355.

     I need not decide the constitutionality of the statutory
scheme since I find that the officers acted in good faith reliance
on the New York City Administrative Code because "its provisions
are such that a reasonable officer would not have known that the
statute was unconstitutional."  Id. at 356-57 & n.13.  Officer
Tejada and Sgt. Glancy testified that they had each issued more
than 10 summonses for public urination (4/15/10 Tr. at 31-32, 204)
and no New York court has determined that the statutory scheme is

invalid.[15]  Officer Mosquera testified that he did not know that
the New York City Health Code treated the offense as a
misdemeanor.  4/15/10 Tr. at 160.  Moreover, application of the
exclusionary rule here would have no deterrent effect on the
officers since they intended to issue a summons to the defendant
for the lesser offense.

Motion to Dismiss

    The defendant moves to dismiss the indictment on the ground
that the felon-in-possession statute, 18 U.S.C. § 922(g), is
unconstitutional.  Specifically, the defendant argues that the
offense with which he is charged is purely local and has no effect
on interstate commerce.  See Def.'s Br. at 14-15 (citing United
States v. Lopez, 514 U.S. 549 (1995)).  In Lopez, the Supreme
Court held that the Gun Free Zone Act, which prohibited possession
of a firearm in a school zone, was beyond Congress' Commerce
Clause authority since there was no requirement that the gun
possession affect interstate commerce.  Id. at 561-62.

    In United States v. Sorrentino, 72 F.3d 294, 296 (2d Cir.
1995), the Second Circuit expressly rejected the argument that
section 922(g) was unconstitutional under the standards in Lopez.
There, the court found that section 922(g) included the "minimal
nexus" with interstate commerce that the Commerce Clause requires

---

        [15] In People v. Offen, 96 Misc.2d 147, 152 (N.Y. City Crim.
Ct. 1978), although the Criminal Court judge opined that a
statutory amendment "would be appropriate" to  provide guidelines
for the application of the Administrative Code and Health Code
littering provisions, the judge denied the defendant's motion to
dismiss the littering charge.

and the statute at issue in <u>Lopez</u> lacked.  <u>Id.</u>  The Second Circuit
reaffirmed that view in <u>United States v. Santiago</u>, 238 F.3d 213
(2d Cir. 2001), after considering more recent Supreme Court cases
addressing Commerce Clause challenges.  There, the court held that
section 922(g) "includes an express jurisdictional element
requiring the government to provide evidence in each prosecution
of a sufficient nexus between the charged offense and interstate
or foreign commerce."  <u>Id.</u> at 216.  Therefore, defendant's facial
challenge to section 922(g) must be denied under Second Circuit
authority.

     To the extent the defendant raises an "as applied" challenge,
that argument also fails. "'[P]roof that the possessed firearm
previously traveled in interstate commerce is sufficient to
satisfy the statutorily required nexus between the possession of a
firearm by a convicted felon and commerce.'" <u>Sorrentino</u>, 72 F.3d
at 296 (quoting <u>Scarborough v. United States</u>, 431 U.S. 563 (1977))
(upholding predecessor statute to section 922(g)).  Here, the
complaint states that "all Bersa .380 caliber pistols are
manufactured outside the State of New York."  Compl. at ¶ 4.  Such
an allegation provides the requisite nexus with interstate
commerce.  <u>See</u> <u>United States v. Johnson</u>, 192 Fed. Appx. 43, 45 (2d
Cir. 2006); <u>United States v. Sanders</u>, 35 F.3d 61, 62 (2d Cir.
1994) (affirming conviction where "ammunition's only nexus to
interstate commerce is that it had been manufactured in another
state and reached New York via interested commerce at some
unspecified time prior to [defendant's] possession of it"); <u>United</u>

States v. Jones, 16 F.3d 487, 491 (2d Cir. 1994) ("Testimony that a weapon was manufactured out of state is generally sufficient to meet the interstate commerce element.")

Motion to Preclude Evidence of Defendant's Prior Felony Conviction or Bifurcate Trial

The defendant argues that the fact of the defendant's prior convictions should not be revealed to the jury, or, in the alternative, the trial should be bifurcated on the issues of possession of the firearm and his prior felony convictions. However, binding Second Circuit precedent forecloses the defendant's arguments.

In United States v. Chevere, 368 F.3d 120 (2d Cir. 2004), the Second Circuit held that "a district court has no discretion, in a prosecution under § 922(g)(1), to allow a defendant to stipulate to a prior conviction and thereby entirely withhold that element of the offense from the jury's consideration."  368 F.3d at 121; see also United States v. Gilliam, 994 F.2d 97, 100-03 (2d Cir. 1993) (affirming refusal of defendant's proposal to stipulate to prior conviction element and thereby keep the fact of his prior conviction from the jury).  The court went on to note that while "a defendant may, by stipulating that he has a prior felony conviction, prevent the jury from hearing about the nature or underlying facts of the conviction, he may not prevent the jury from learning the fact that he has a prior felony conviction - a 'crucial element of the offense.'"  Chevere, 368 F.3d at 121.  Any risk of unfair prejudice from the jury's knowledge about the

-38-

defendant's prior conviction can be adequately addressed by a proper curative instruction.  See United States v. Belk, 346 F.3d 305, 311 (2d Cir. 2003); Gilliam, 994 F.2d at 100.

   While acknowledging that Second Circuit authority precludes the relief he seeks, the defendant argues that those cases are wrongly decided and contrary to the reasoning of the Supreme Court in Old Chief v. United States, 519 U.S. 172 (1997).  However, this Court is obligated to follow controlling precedent.  See Jaffree v. Bd. of Sch. Comm'rs of Mobile Co., 459 U.S. 1314, 1316 (1983); United States v. Allah, 130 F.3d 33, 38 (2d Cir. 1997); United States v. Belk, No. 01 CR. 180, 2002 WL 237837, at *3 (S.D.N.Y. Feb. 19, 2002).  The Second Circuit in Chevere and Belk, which were issued several years after Old Chief, reaffirmed its earlier conclusion in Gilliam that a court cannot entirely remove the element of a defendant's prior conviction from a jury's consideration in a section 922(g)(1) case.  Regardless, the Second Circuit's decisions on this issue are consistent with the reasoning of Old Chief.  The Supreme Court held only that a defendant's offer to stipulate to the fact of a prior offense should not be spurned in favor of admitting evidence of the name and nature of a defendant's conviction.  Old Chief, 519 U.S. at 190-91.  The Second Circuit expressly recognized in Chevere that a defendant could stipulate to the fact of a prior conviction to prevent the jury from hearing about the nature and underlying facts of that conviction.  368 F.3d at 121.  Indeed, the government has agreed to stipulate to the fact of the defendant's

-39-

prior felony convictions and that it will not introduce the name, nature or substance of the those convictions.  Govt.'s Opp. at 30.

The defendant's alternate proposal of bifurcation also must be rejected under Second Circuit law.  In In re United States, 418 F.3d 220 (2d Cir. 2005), the court held that "bifurcation of the elements of a single-count felon-in-possession trial, absent the government's consent, is generally error."  418 F.3d at 224. Where, as here, "the government agrees to stipulate to the fact of the prior felony without going into the underlying facts, there can be no unfair prejudice justifying bifurcation."  Id.  Only in the "extraordinarily unusual case," such as where the "facts underlying the prior felony would be presented to the jury and are so heinous as to overwhelm the trial" of firearm possession, would bifurcation be appropriate.  Id.; Belk, 346 F.3d at 311. Defendant's claims that this is an "extraordinarily unusual case" are overblown.  If the parties stipulate to the fact of the defendant's prior convictions, the age and nature of his convictions will not be disclosed to the jury.  Consequently, there could be "no unfair prejudice justifying bifurcation."  In re United States, 418 F.3d at 224; Belk, 346 F.3d at 310.  Nor does the fact that the defendant's credibility may be a key issue in this case make bifurcation appropriate.  See Chevere, 368 F.3d at 123.

As to the defendant's request that the Court preclude cross-examination of the defendant concerning prior crimes, it is premature to address that issue.

CONCLUSION

For the foregoing reasons, I recommend that the defendant's motion to suppress the physical evidence seized from his person be denied, the motion to dismiss be denied and the motion to preclude evidence or bifurcate trial be denied.

This report and recommendation will be electronically filed and notice electronically sent to the parties on this date.  Any objections to this Report and Recommendation must be electronically filed, with a courtesy copy sent to Judge Cogan, by July 9, 2010.  Failure to file objections within the specified time waives the right to appeal.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

**SO ORDERED.**

Dated: Brooklyn, New York
       June 22, 2010

                              /s/
                              MARILYN D. GO
                              UNITED STATES MAGISTRATE JUDGE